STEWART J. LEONARD, SR. *v.* COMMISSIONER OF
REVENUE SERVICES
(SC 16735)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued March 18—officially released June 10, 2003

*Richard K. Greenberg,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Eliot D. Prescott,* assistant attorney general, for the appellant (defendant).

*Nathan M. Silverstein,* with whom was *Kurt F. Zimmermann,* for the appellee (petitioner).

*Opinion*

KATZ, J. The defendant, the commissioner of revenue services, appeals[1] from the judgment of the trial court sustaining the appeal by the plaintiff, Stewart J. Leonard, Sr., doing business as Stew Leonard's Dairy (Dairy), from the defendant's decision imposing a deficiency assessment for sales and use tax, interest and a 25 percent penalty. The defendant claims that the trial court improperly construed the requirements for proving fraud and intent to evade under General Statutes (Rev. to 1991) § 12-415[2] when the court concluded

[1] The defendant appealed from the judgment of the trial court to the Appellate Court. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes (Rev. to 1991) § 12-415 provides in relevant part: "(1) . . . If the commissioner [of revenue services] is not satisfied with the return or returns of the tax or the amount of tax required to be paid to the state by any person, he may compute and assess the amount required to be paid upon the basis of the facts contained in the return or returns or upon the basis of any information within his possession or that may come into the commissioner's possession. One or more deficiency assessments may be made of the amount due for one or for more than one period. . . .

"(5) . . . When it appears that any part of the deficiency for which a deficiency assessment is made is due to fraud or intent to evade the provisions of this chapter or regulations promulgated thereunder, there shall be imposed a penalty equal to twenty-five per cent of the amount of such deficiency assessment. No taxpayer shall be subject to a penalty under both subsections (4) and (5) of this section in relation to the same tax period. . . .

that: (1) the exception to the three year statute of limitations under § 12-415 (7) had not been established and, accordingly, that pre-1989 assessments were time barred; and (2) the 25 percent penalty under § 12-415 (5) could not be imposed. The defendant further claims that the trial court improperly sustained the plaintiff's appeal with respect to the post-1989 deficiency assessments on the ground that those assessments were arbitrary and unsupported by the evidence. We conclude that the trial court improperly concluded that pre-1989 assessments were time barred. We further conclude, however, that the trial court properly concluded that the post-1989 deficiency assessments were improper. Accordingly, we reverse in part the judgment of the trial court.

A joint stipulation of facts submitted to the trial court provides much of the largely undisputed factual basis for this appeal. Since at least July 1, 1981, the plaintiff has owned and operated the Dairy, a partnership that engaged in a retail dairy and grocery sales business with its principal place of business in Norwalk. In July, 1991, the Internal Revenue Service (IRS) commenced an investigation of the plaintiff and the Dairy and, as a result, discovered that the plaintiff and certain Dairy employees had devised a scheme by which they systematically diverted cash receipts from the Dairy's bank deposits and altered financial records, including gross sales figures, to correspond with the diverted cash

"(7) . . . Except in the case of fraud, intent to evade this chapter or authorized regulations, failure to make a return, or claim for additional amount pursuant to subsection (3) of section 12-418, every notice of a deficiency assessment shall be mailed within three years after the last day of the month following the period for which the amount is proposed to be assessed or within three years after the return is filed, whichever period expires later. . . ."

This section has been amended since 1991 to change, inter alia, the numbered subsections to lettered subsections. See, e.g., Public Acts 1998, No. 98-262, § 7. The references herein are to the 1991 revision of the statute.

receipts. As part of this scheme, the participants instituted a computer software program at the Dairy, dubbed "Equity" (Equity program) by the scheme participants, which reduced the record of gross sales and corresponding inventory data by the amount of cash diverted each week. The Equity program wrote over the original data, including gross sales, and replaced that data with false data, which then was used to prepare the weekly financial report. Consequently, the original data was irretrievable. Gross receipts altered by the Equity program were then recorded in the Dairy's books and records.

As a result of its investigation, the IRS instituted criminal proceedings against the plaintiff and other scheme participants, alleging that the diversion of receipts and the alteration of records caused the Dairy's gross receipts to be understated substantially on its federal partnership tax returns for 1981 through 1990 and that the plaintiff similarly had underreported income on his personal federal income tax returns. The plaintiff and three other Dairy employees pleaded guilty to having conspired illegally to defraud the federal government by impeding and impairing the lawful functions of the IRS in violation of 18 U.S.C. § 371. The plaintiff and the IRS agreed that the plaintiff would pay $15 million in taxes, interest and penalties in settlement of all federal tax liabilities for the years 1981 through 1991. This amount was calculated based, in part, on an arbitrary figure, agreed to by the parties, of $12,500,000 in unreported gross sales.

As a result of the IRS actions, in February, 1992, the state department of revenue services (department) commenced an audit of the sales and use tax returns of the Dairy. On February 27, 1996, an audit examiner for the department issued a final tax determination report, proposing increases of $511,821.15 in the Dairy's sales and use tax liabilities for the taxable periods of

July, 1983, through March, 1992. As the basis for the assessment, the examiner relied on the $12,500,000 gross sales figure contained in the plaintiff's settlement with the IRS, allocated among the fiscal years at issue. On March 15, 1996, the defendant issued a notice of assessment in accordance with the examiner's report for a total assessment of $1,402,514.24—$511,821.15 in sales and use tax liability, $742,278.10 in interest and $148,414.99 in penalties. The plaintiff agreed that $172,984 of the total assessment was valid for certain expenses improperly deducted on its returns and for additional sales and use tax owed. The plaintiff issued payment in that amount, but contested the balance of the tax assessment and the penalty, filing a petition for reassessment to the department's appellate division. After hearings on the matter, the defendant issued notice of his decision denying the plaintiff's petition.

Thereafter, the plaintiff appealed, pursuant to General Statutes § 12-422, from the defendant's decision to the Superior Court. The plaintiff raised two issues on appeal: (1) whether the three year statute of limitations under § 12-415 (7) barred deficiency assessments for the periods prior to February, 1989;[3] and (2) whether the assessment and the penalty were valid. The parties submitted a stipulation of facts and stipulated exhibits to *Hon. Arnold W. Aronson,* judge trial referee, acting as a trial court. By agreement of the parties, the court bifurcated the trial to address separately the two time periods at issue.

The plaintiff submitted as stipulated exhibits the depositions of Jeffrey Pirhalla, the computer specialist

---

[3] Assessments for the periods after 1989 were not at issue, with respect to the statute of limitations issue, because, during the course of the department's audit of the Dairy's records, the plaintiff executed several consents to extend the limitations period, which resulted in extensions until April 30, 1996, for mailing assessments for the period of February 28, 1989, through February 28, 1993.

who designed and implemented the Equity program, John M. Peters, the Dairy's comptroller, and Stephen Guthman, the Dairy's former chief executive officer, on the issues of the Dairy's sales tax collection and reporting methods and the effect of the Equity program on those methods. Each testified that the Equity program had no effect on sales tax. Specifically, Pirhalla testified that the program was designed to alter certain fields of information in order to conceal the cash diversions, but that the sales tax data that had been transmitted from the cash registers at the time it was collected had not been altered. He further testified that the Equity program software and computer printouts reflecting the data manipulation had been taken and retained by the IRS.

The plaintiff also presented testimony by Kevin Faustine, Lawrence Marini and Doreen Schulze, current and former IRS agents who had been involved in investigating the plaintiff's federal tax fraud case. The agents testified that they had no information leading them to conclude that the Equity program had an effect on sales tax. Specifically, Schulze, an IRS computer specialist, testified that, in conducting her investigation, she would have noticed and reported if the sales tax figures had been affected by the program. All three agents indicated on cross-examination that they had not taken any measures to verify the sales tax when investigating the Equity program.

Two department employees testified for the commissioner. Angela White, the department revenue examiner who issued the Dairy's tax determination report, testified that the deficiency assessment was based primarily on the IRS settlement figure, due to the limited availability of other records with which to verify sales tax.[4] In

---

[4] It appears from the record that the unavailability of records was due in part to the plaintiff's destruction of records, either by application of the Equity program or the shredding of cash receipts, and in part to the IRS' retention of certain records.

addition, White relied on two "current week activity reports" reflecting the Dairy's sales data for the same week, one reflecting data before application of the Equity program, and the other reflecting data after the Equity program had run, altering data. Both White and Michael O'Sullivan, a tax appellate officer, testified that their analysis of the two reports, based on certain calculations O'Sullivan had made, indicated a discrepancy between the sales tax that should have been collected for that week and the sales tax reflected in the financial report. O'Sullivan attributed this discrepancy to the Equity program, although he stated that he did not know how the program operated. He had tried to obtain a copy of the program from the IRS, but it denied his request.

In his trial brief, the defendant contended that pre-1989 assessments were not barred by the statute of limitations under § 12-415 (7), because the fraud and intent to evade exceptions set forth therein were applicable. See footnote 2 of this opinion. Specifically, the defendant contended that fraud against the federal government and the false statement of gross sales on the state returns demonstrated fraud and that the plaintiff's wilful destruction of records demonstrated an intent to evade under § 12-415. In its memorandum of decision in the first phase of the proceedings, the trial court concluded that the pre-1989 assessments were time barred because the defendant had failed to satisfy his burden of proving "by clear and convincing evidence that the plaintiff . . . committed fraud . . . by wilful wrongdoing with the specific intent to deprive the state of taxes known by the plaintiff to be owed." The trial court acknowledged that the defendant's audit was "hampered by the unavailability of [certain] records," as a result of the Equity program's erasure of certain computer generated data and by the retention of certain records by the IRS. The trial court concluded, however, that the evidence demonstrated that the program had

been designed only to understate the Dairy's gross receipts in order to reduce the plaintiff's federal income tax liability and that no evidence showed that the Dairy's sales tax, which had been generated at the sale terminals, was affected. The court rejected the defendant's contention that proof that the plaintiff had committed fraud against the IRS was relevant to whether fraud had been committed against the state. Therefore, the trial court concluded that the fraud exception was inapplicable and that the pre-1989 assessments were time barred pursuant to § 12-415. The commissioner then filed a motion for reconsideration, asking, inter alia, that the court consider whether the exception under § 12-415 (7) for "intent to evade" the tax statutes or regulations had been satisfied. The court denied the motion.

Thereafter, the trial court conducted the second phase of the bifurcated proceeding to address the propriety of the deficiency assessments and related fraud penalty for the periods not time barred, namely, those after 1989. The parties agreed, with the consent of the court, to submit these issues based on the record already before the court. In its memorandum of decision, the trial court noted that the defendant essentially had relied on the same arguments that he had made in the first stage of the trial—proof of fraud in dealing with the IRS, the underreported income figure used in the IRS settlement and the destruction of records. For the same reasons it had rejected those arguments in the first phase, the court rejected the defendant's contention that these facts were a proper basis on which the defendant could assess deficiencies and a fraud penalty. Specifically, the court noted the fact that the defendant had relied on the arbitrary income figure derived from the plaintiff's settlement with the IRS and that IRS agents testified that the Equity program had no effect on the sales tax. The court rejected as not

credible O'Sullivan's testimony that the comparison of the two activity reports reflecting sales data before and after the Equity program had been run indicated that the Dairy's sales tax had been affected by the program. Accordingly, the trial court sustained the plaintiff's appeal.

Pursuant to a motion by the defendant, the trial court thereafter issued an articulation on whether it also had found that there was no proof of intent to evade the tax provisions. The court stated in its articulation that "[p]roof that the plaintiff intended to evade taxes is necessary for a finding that the plaintiff committed fraud. . . . In finding that the [defendant] did not meet his burden of proving that the plaintiff committed fraud, this court found that the evidence before it was insufficient to support a finding that the plaintiff had intended to evade the Connecticut sales tax." This appeal followed.

We begin by setting forth our well established standard of review. "[A] sales and use tax appeal taken pursuant to § 12-422 is a trial de novo." *Gallacher* v. *Commissioner of Revenue Services*, 221 Conn. 166, 176, 602 A.2d 996 (1992); accord *Jones* v. *Crystal*, 242 Conn. 599, 601, 699 A.2d 961 (1997), overruled in part on other grounds, *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 542 n.16, 782 A.2d 670 (2001). Accordingly, "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Andersen*

*Consulting, LLP* v. *Gavin,* 255 Conn. 498, 511, 767 A.2d 692 (2001).

Moreover, we consider the trial court's decision mindful of certain fundamental principles applicable to the statutory construction of tax statutes. "[W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer." (Internal quotation marks omitted.) Id.; accord *Zachs* v. *Groppo,* 207 Conn. 683, 689, 542 A.2d 1145 (1988). "[S]tatutes establishing the procedure for the collection of taxes, including statutes enacted to prevent tax frauds, [however] are given a liberal, rather than strict, construction." *United Illuminating Co.* v. *New Haven,* 240 Conn. 422, 461–62, 692 A.2d 742 (1997); see 3A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 66.06, pp. 32–33; see also 68 Am. Jur. 2d, Sales and Use Taxes § 245 (2000) (statute of limitations on deficiency assessments strictly construed in favor of government). Finally, in construing our tax laws, we often look to federal law, in recognition that, in many instances, "our tax laws incorporate federal tax principles . . . ." (Citations omitted.) *Skaarup Shipping Corp.* v. *Commissioner of Revenue Services,* 199 Conn. 346, 351, 507 A.2d 988 (1986); accord *Berkley* v. *Gavin,* 253 Conn. 761, 773–74, 756 A.2d 248 (2000). With these principles in mind, we turn to the defendant's claims.

I

We address the issues in the sequence in which the trial court addressed them and, accordingly, first consider whether the trial court properly concluded that certain assessments were time barred because the defendant had failed to sustain his burden of proving fraud or intent to evade the tax provisions under § 12-415. The defendant contends that the plaintiff's fraud

against the IRS constitutes fraud or intent to evade for purposes of the statute of limitations when those fraudulent acts directly affected the defendant's ability to audit the plaintiff's returns. Specifically, the defendant notes that the same false information provided to the IRS—understated gross sales income figures—was a material misstatement provided to the defendant on state sales tax returns and the destruction of records by the Equity program deprived the defendant of an opportunity to audit and verify the returns properly. The defendant contends that the trial court improperly failed to consider these facts as evidence of fraud or intent to evade the tax provisions. We agree.

General Statutes (Rev. to 1991) § 12-415 (7) provides in relevant part: "Except in the case of fraud [or] intent to evade this chapter or authorized regulations . . . every notice of a deficiency assessment shall be mailed within three years after the last day of the month following the period for which the amount is proposed to be assessed or within three years after the return is filed, whichever period expires later. . . ." Chapter 219 of the state tax code—the Sales and Use Taxes Act, General Statutes § 12-406 et seq.—does not define "fraud." Under the common law, however, it is well settled that the essential elements of fraud are: " '(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury.' *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 539, 661 A.2d 530 (1995)." *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 777, 802 A.2d 44 (2002). Although we previously have not addressed the burden of proof in tax fraud or intent to evade cases, consistent with our approach to common-law fraud claims in other contexts; *Barbara Weis-*

*man, Trustee* v. *Kaspar,* supra, 540; *Kilduff* v. *Adams, Inc.,* 219 Conn. 314, 329–30, 593 A.2d 478 (1991); and federal law; 26 U.S.C. § 7454 (a); we conclude that the burden is on the defendant to prove that a taxpayer has committed fraud or intent to evade the tax provisions.

Under chapter 219, certain reporting and record keeping requirements are imposed on sellers and retailers. For example, General Statutes § 12-414 (3) provides in part that, "[f]or purposes of the sales tax the return shall show the gross receipts of the seller during the preceding reporting period. . . ." Moreover, a seller "shall keep such records, receipts, invoices and other pertinent papers in such form as the commissioner [of revenue services] requires"; General Statutes § 12-426 (3) (A); so that the commissioner may examine such records and "investigate the character of the business . . . in order to verify the accuracy of any return made . . . ." General Statutes § 12-426 (4).

Pursuant to his authority under § 12-426 (1), the defendant has promulgated regulations on record keeping, which, at the time of the transactions here, provided in relevant part: "Each seller and each retailer . . . shall keep adequate and complete records of his business in this State showing: (1) The gross receipts from the sale or lease of tangible personal property or from sale of services, including both taxable and non-taxable items and any services that are a part of a sale. . . .

"Such records shall include the normal books of account ordinarily maintained by the average prudent business man engaged in the activity in question, together with all bills, receipts, invoices, cash register tapes or other documents of original entry supporting the entries in the books of account . . . .

"Failure to maintain such records will be considered evidence of negligence or intent to evade the tax and

will result in the imposition of appropriate penalties."
Regs., Conn. State Agencies § 12-426-23 (a).[5]

In the present case, the stipulation submitted to the trial court included the following facts relevant to whether the plaintiff had violated these reporting and record keeping requirements. The Dairy's sales recording system was composed of a computerized cash register system that recorded the sales at the time of the transaction. At the point of sale, each product, which contained a universal product code (UPC) indicating its taxable or nontaxable status, was scanned and the resulting sales information was transmitted to the main computer terminal. The Equity program, among other things, altered some of the UPC-based computerized records of the Dairy's gross sales. Specifically, the program reduced item and dollar sales across a broad range of products to correspond with the amount of cash diverted each week. As we noted previously, the Equity program did this by writing over the original sales data, thereby rendering the original data irretrievable.

In our view, the result was akin to destroying the electronic equivalent of cash register tapes and replacing those tapes with ones containing false sales data.[6] It is clear that such undisputed conduct violates the regulations that were in effect at the time requiring

[5] Section 12-426-23 of the Regulations of Connecticut State Agencies, which became effective April 7, 1980, and was in effect at the time of the transactions involved in this case; see Regs., Conn. State Agencies, Sup. 64, Pt. 1 (June 27, 2000); was repealed on August 22, 2000, and replaced with more comprehensive record keeping requirements. See Regs., Conn. State Agencies § 12-2-12. We refer herein to § 12-426-23, as it was the governing regulation at the time of the proceedings here.

[6] Peters, the Dairy's comptroller, and Guthman, the Dairy's chief executive officer, testified in depositions submitted to the trial court as stipulated exhibits that actual cash register tapes had existed, but those tapes had been shredded because the same information was contained in the computer generated reports.

the retention of sales records. See Regs., Conn. State Agencies § 12-426-23 (a); footnote 5 of this opinion; see also *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 699, 784 A.2d 354 (2001) (application of regulations to undisputed facts of case presents question of law). The trial court's memorandum of decision, however, does not reflect that the destruction of these records was presumptive evidence of an intent to evade the tax provisions. Instead, the trial court acknowledged that the unavailability of records "hampered" the defendant's ability to audit, but rejected the defendant's claim because he had failed to show any intent by the plaintiff to defraud the state by underreporting sales tax.

Section 12-415 does not require proof of an intent to evade *sales tax*; it requires proof of intent to evade the Sales and Use Tax Act or authorized regulations; General Statutes (Rev. to 1991) § 12-415 (7); and those laws require accurate reporting and record keeping. This distinction is evidenced by the fact that § 12-415 provides that the statute of limitations may be tolled, inter alia, by proof of either fraud *or* intent to evade. Cf. 26 U.S.C. § 7454 (burden of proof when "petitioner has been guilty of fraud *with* intent to evade" [emphasis added]). Instead of treating these exceptions as different means by which the defendant may toll the limitations period, the trial court's articulation makes clear that it construed intent to evade as an *element* of fraud.[7]

---

[7] The trial court stated in its articulation: "The existence of fraud is a factual question to be determined from all the facts and circumstances in evidence. . . . The taxing authority meets its burden of proof by showing the taxpayer *intended to evade taxes* known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. . . . Proof that the plaintiff intended to evade taxes is necessary for a finding that the plaintiff committed fraud. . . . In finding that the [defendant] did not meet his burden of proving that the plaintiff committed fraud, this court found that the evidence before it was insufficient to support a finding that the plaintiff had intended to evade the Connecticut sales tax. Accordingly, the [defendant] did not prove that the assessment involved a case of fraud or intent to evade the sales tax statutes or regulations." (Citations omitted; emphasis in original.)

It is clear, however, that, by listing these two exceptions in the disjunctive, the legislature did not intend for the defendant to have to prove fraud in order to toll the limitations period when intent to evade could be proven. See *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 173 n.5, 713 A.2d 1269 (1998) ("[t]he two types of laws are placed in the disjunctive, and, absent any indication that one is subordinate to the other or that one is meant to define the other, each phrase must be given equal weight as an independent limitation"); see also *State* v. *Angell*, 237 Conn. 321, 329, 677 A.2d 912 (1996) ("[a]lthough we have, on occasion, construed 'or' to mean 'and' . . . we do so only when 'such construction clearly appears to have been the [drafters'] intent' " [citation omitted]).

The fact that the plaintiff intentionally had destroyed records that he legally was obligated to retain is presumptive evidence of an intent to evade the tax provisions as a matter of law. We also note that the false reporting of total gross sales on the Dairy's sales and use tax returns is further evidence of intent to evade the tax provisions. Had the plaintiff *accurately* reported gross sales on the state returns during the same period in which he underreported gross sales on the federal returns, it is quite possible, if not likely, that the Equity program scheme would have been discovered earlier.[8] Because § 12-415 (7) provides for tolling of the limitations period upon proof of intent to evade the sales and use tax regulations and those regulations expressly provided at the time that "[f]ailure to maintain such records will be considered evidence of . . . intent to evade the tax"; Regs., Conn. State Agencies § 12-426-23 (a); see footnote 5 of this opinion; the trial court's

[8] Indeed, White, a revenue examiner for the department, testified that gross sales are one of three components used to verify sales and use tax returns and that part of the auditing process involves a comparison of sales and use tax returns and federal returns.

construction of § 12-415 (7) and its failure to apply the regulatory presumption was an abuse of discretion. See *Unkelbach* v. *McNary*, 244 Conn. 350, 367, 710 A.2d 717 (1998) (trial court's failure to apply statutory guidelines constitutes incorrect application of law, and, therefore, abuse of discretion).

The plaintiff asserted at oral argument before this court that, because the regulations at issue require that he retain records for only three years, this court cannot consider his failure to retain records for the period at issue. We disagree. That limitation period is irrelevant when the defendant establishes that a taxpayer intentionally has altered and thereby destroyed the original records almost immediately after they were created. Therefore, the limitation, likely aimed at limiting a burden on taxpayers, does not create the desired shield in this case. Accordingly, we conclude that, based on its incorrect application of the law and the consequential failure to consider relevant evidence, the trial court improperly determined that deficiency assessments for periods prior to February, 1989, were time barred.

II

We next turn to the issues addressed by the trial court in the second phase of the proceedings, which pertain to the propriety of the post-1989 assessments and the related fraud penalty. The defendant claims that the deficiencies reasonably and properly were assessed based on the difficult circumstances created by the plaintiff. Specifically, the defendant points to the IRS settlement figure and O'Sullivan's analysis of the only week of unadulterated sales as reliable proof that the plaintiff underreported sales tax. The plaintiff contends that the trial court properly concluded that there was no evidence that the plaintiff's actions with regard to federal tax returns had any effect on state sales and use tax collection. The plaintiff also contends that the

trial court properly determined that the assessment was unreasonable because it was based on the IRS settlement figure, which was unrelated to actual tax records and was not the same time period at issue in the assessments.

We begin with the legal principles relevant to our analysis of these claims. Under the Sales and Use Taxes Act, "[i]f the commissioner [of revenue services] is not satisfied with the return or returns of the tax or the amount of tax required to be paid to the state by any person, he may compute and assess the amount required to be paid upon the basis of the facts contained in the return or returns or upon the basis of any information within his possession or that may come into the commissioner's possession. . . ." General Statutes (Rev. to 1991) § 12-415 (1). "Inadequate taxpayer records may be the basis for a prima facie finding that the taxing authority's tax assessment is correct." 68 Am. Jur. 2d, supra, § 246. It is well established that "the burden of proving an error in a deficiency assessment is on the plaintiff . . . ." (Citations omitted.) *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services*, 198 Conn. 624, 634, 504 A.2d 506 (1986); see *H. B. Sanson, Inc.* v. *Tax Commissioner*, 187 Conn. 581, 586, 447 A.2d 12 (1982); *Fusco-Amatruda Co.* v. *Tax Commissioner*, 168 Conn. 597, 599, 362 A.2d 847 (1975). The plaintiff "must present clear and convincing evidence that the assessment is incorrect or that the method of audit or amount of tax assessed was erroneous or unreasonable." 68 Am. Jur. 2d, supra, § 246. When considering this issue, "[b]ecause a tax appeal is heard de novo, a trial court judge is privileged to adopt whatever testimony he reasonably believes to be credible." (Internal quotation marks omitted.) *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 755–56, 699 A.2d 81 (1997); accord *Newbury Commons Ltd.*

*Partnership* v. *Stamford,* 226 Conn. 92, 99, 626 A.2d 1292 (1993).

In its memorandum of decision on the phase two proceedings, the trial court concluded that the plaintiff had met his burden of proving that the deficiency was improper.[9] Specifically, the court found that the IRS settlement figure on which the defendant relied was an arbitrary figure not based on any Dairy records, a fact which is not in dispute. The court further found that there was no credible evidence that the plaintiff had underreported sales tax.

We review this finding pursuant to the well established clearly erroneous standard of review. *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* 262 Conn. 213, 219–20, 811 A.2d 1277 (2002); *United Technologies Corp.* v. *East Windsor,* 262 Conn. 11, 23, 807 A.2d 955 (2002). "Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction

---

[9] Certain language in the trial court's memorandum of decision suggests that it questioned whether the defendant properly claimed that the plaintiff bore the burden of proof in this proceeding. If the court had placed the burden on the defendant to prove that the deficiency properly was assessed, the court improperly allocated the burden of proof. *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services,* supra, 198 Conn. 634. We note, however, that, in reaching its ultimate conclusion, the trial court first relied on the credibility of testimony by the plaintiff's witnesses, and then rejected the defendant's evidence. We therefore conclude that the court properly rejected the defendant's evidence only after it first concluded that the plaintiff had demonstrated that the deficiency was improper.

that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor,* supra, 23.

We conclude that the trial court's conclusion was supported by ample evidence in the record. Pirhalla and Guthman, the former Dairy employees, and the IRS agents all testified that operation of the Equity program had no impact on sales tax collection and reporting. Pirhalla explained that sales information was transmitted at the point of sale from the computer sales terminal into two files—a UPC file and a financial file. The UPC file tracked item information; the financial file contained total store financial data. Pirhalla testified that the Equity program altered unit data in the UPC file. He further testified that, even if the Equity program had altered the unit sales of some taxable items, the sales tax data would have been unaffected because that information was transmitted daily as a lump sum figure from the computer sales terminals into the other file, the financial file. Although the Equity program was designed to alter certain fields of information in the financial file, specifically total sales and total bank deposits, Pirhalla testified that it was not designed to alter the field containing sales tax figures. Guthman's testimony supported Pirhalla's testimony. As we noted previously, the IRS agents uniformly testified that they had no evidence that the Equity program affected sales tax. Most important, Schulze, the IRS computer specialist, testified that, although she did not check specifically for the effect of the Equity program on sales tax, she would have noticed if the program had affected sales tax.

The court also credited the testimony of Peters, the Dairy's comptroller who was not a participant in the fraud scheme, as to the reporting and computation of sales tax for the Dairy's sales and use tax returns. Peters testified that the Dairy never separately kept track of

taxable sales. Instead, he used the sales tax figure recorded in the financial file to determine the taxable gross sales for each week. Peters did this by "backing into" the taxable sales, one of two methods commonly used in retail operations, according to White, the department auditor. This means that Peters would take the sales tax figure reflected in the financial file and divide that figure by the sales tax percentage to arrive at the taxable gross sales, which was entered onto records used for sales tax returns. The taxable sales were then subtracted from the total sales figure, the figure altered by the Equity program, to arrive at a total nontaxable sales figure for the reports.

In view of all of this evidence, we cannot conclude that the trial court's conclusion that the deficiency assessment was improper was clearly erroneous. The defendant's position, however, is that the plaintiff's substantial underreporting of the Dairy's gross sales *must* have impacted taxable sales. Because only a minimal percentage of the Dairy's sales are taxable,[10] however, it is entirely plausible that sums could be skimmed off only nontaxable sales receipts.

The defendant also contends that the trial court improperly rejected O'Sullivan's testimony, which was based on his comparison of two reports reflecting the only week of unadulterated sales reports, that led him to conclude that the Equity program did result in an underreporting of sales tax. The credibility and weight to be accorded a witness' testimony, however, is within the province of the trial court. *Shapero* v. *Mercede,* 262 Conn. 1, 9 n.5, 808 A.2d 666 (2002); *Smith* v. *Smith,* 183 Conn. 121, 123, 438 A.2d 842 (1981). Accordingly, the trial court properly could have rejected O'Sullivan's

[10] Guthman estimated that less than 5 percent of the Dairy's sales were taxable. White testified that she thought approximately 15 percent of the sales were taxable, although she acknowledged that she was not sure and that the percentage would vary.

conclusions based on the fact that evidence of a *one week* discrepancy was an insufficient basis on which to extrapolate a *ten year* deficiency. Indeed, the court may have rejected O'Sullivan's conclusion simply based on the fact that he testified that he had no knowledge of how the Equity program actually worked.

The defendant further asserts that his inability to produce a base larger than one week upon which to draw his conclusion results from the plaintiff's wilful destruction of records. Essentially, he contends that an adverse inference should be drawn against the plaintiff. We are sympathetic to the defendant's position that the plaintiff should not be able to profit by destroying records. Although we have recognized that an adverse inference may be drawn when relevant evidence is intentionally destroyed; *Beers* v. *Bayliner Marine Corp.*, 236 Conn. 769, 775–79, 675 A.2d 829 (1996); see 29 Am. Jur. 2d, Evidence § 244 (1994) ("[i]t is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises . . . an inference that this evidence would have been unfavorable"); the inference is a permissive one.[11] In view of the substantial evidence before the trial court that the plaintiff's fraudulent federal income tax evasion scheme had no effect on the reporting of state sales tax, we cannot conclude that the trial court abused its discretion by failing to draw the adverse inference. Accordingly, we conclude that the trial court's finding that the post-1989 deficiency assessments were improper was not clearly erroneous.

The judgment is reversed in part and the case is remanded with direction to order a new trial on the threshold issue of whether the pre-1989 deficiency

---

[11] Although, as we noted in part I of this opinion, the destruction of records are presumptive evidence of intent to evade; see Regs., Conn. State Agencies § 12-426-23 (a) and footnote 5 of this opinion; such destruction is not necessarily proof of fraud.

assessments are time barred, and for further proceedings according to law.

In this opinion the other justices concurred.